# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

JEFFREY COVEY,

               Plaintiff,

   v.

NANCY BERRYHILL,
Acting Commissioner of Social Security,

               Defendant.

**OPINION AND ORDER**

18-cv-32-slc

---

Plaintiff Jeffrey Covey filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, respectively. 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Covey raises two challenges on appeal: (1) the administrative law judge (ALJ) who denied his claim at the administrative level failed to properly account in his residual functional capacity assessment and corresponding hypothetical for Covey's moderate limitations in the area of concentration, persistence or pace; and (2) the ALJ failed to give proper weight to the opinion of Dr. Todd Rave, one of Covey's treating physicians. For the reasons stated below, I am affirming the commissioner's decision.

## I. BACKGROUND

Covey applied for DIB and SSI benefits on January 4, 2013, alleging that he had been disabled since January 1, 2010 from epilepsy, depression, asthma, allergies and back problems. Covey was 38 years old on his alleged disability onset date, had a high school education and had

worked in the past as a grinder at a foundry. After the agency denied Covey's claim initially and on reconsideration, he requested a hearing before an administrative law judge, which was held on September 7, 2016. Covey was represented by counsel at the hearing. Covey testified, as did a neutral vocational expert. On September 16, 2016, the ALJ issued a decision finding Covey not disabled. The Appeals Council denied Covey's request for review, making the hearing decision the final decision of the commissioner.

## II. RELEVANT MEDICAL EVIDENCE

### A. Seizures

#### 1. Medical Records

On April 22, 2012, Covey sought emergency medical treatment after experiencing an event that might have been a seizure. Covey reported that he was with some friends drinking beer while sitting on the back of a truck and next thing he knew, he woke up on the ground. Covey said that he passed out for three to five minutes and bit his tongue. Covey said he had experienced similar episodes of passing out for the past five to six years. At the time of the exam, however, Covey said he was a little tired but mostly felt like his normal self. The ER staff opined that Covey might have passed out from coughing–he had bronchitis at the time and smoked up to two packs of cigarettes a day–and then had a seizure. AR 477-85.

Dr. Paul Atkinson, an epilepsy specialist with the Ministry Medical Group, saw plaintiff on April 25, 2012. Covey indicated that before passing out on April 22, he had experienced a "coughing fit." According to Covey, he had similar incidents of passing out in the past and each time it was associated with a strong attack of coughing. Covey reported that he had never had

2

an episode where he simply lost awareness, or where people could not get his attention. Covey's wife, likewise, indicated that she had never observed Covey experience any such spell.

On mental status exam, Dr. Atkinson noted that plaintiff was awake, alert and oriented, with good attention span and concentration. His recent and remote memories were intact. Dr. Atkinson questioned whether Covey's April 22 spell was a seizure versus a fainting episode, but suspected seizure because Covey bit his tongue and was confused afterward. He ordered an EEG and encouraged Covey to stop smoking to address his chronic cough and shortness of breath. Covey asked Dr. Atkinson whether he should seek disability. Dr. Atkinson replied that it would not be appropriate to do so based on a single episode, but he advised him not to drive, bathe alone or work at heights. AR 608-10.

Covey saw Dr. Atkinson in follow up on June 8, 2012, after having cancelled a couple of appointments. He said he had not had any seizures since the April 22 incident. However, Covey's EEG was abnormal, showing left temporal slowing and left temporal epileptiform discharges. Based on the abnormal EEG, Dr. Atkinson diagnosed suspected complex partial seizures and started Covey on anti-seizure medication. AR 605-06.

Covey next saw Dr. Atkinson six months later, on December 7, 2012. He reported doing well since his last visit with no overt seizure activity. He was taking his medication regularly without side effects and overall did not have any new concerns. Dr. Atkinson noted that Covey was pleasant, well groomed and in no apparent distress. Covey's concentration, attention, and memories all were intact and his fund of knowledge was appropriate. AR 602-03. Atkinson noted that Covey would be legal to drive if he had no episodes of lost awareness for 90 days and had a therapeutic medication level.

Plaintiff saw Dr. Dotti, a neurologist, on April 24, 2013, approximately a year after the first seizure incident. (Dr. Dotti took over Covey's case after Dr. Atkinson left the medical practice.) Dotti noted that Covey had asked him to fill out forms for disability. Dotti wrote:

> I am not so sure that this patient has epilepsy . . . I told him that I am not an epilepsy specialist, so I would like to transfer him to Marshfield. Some of the spells (especially the first one) were associated with cough and to me those are more similar to syncope . . . The diagnosis of seizure was based only on one abnormal EEG, so it is possible that he may have also seizures but also cough induced syncope. Only at the end of the visit he told me that he had a seizure 1 month ago. He really wanted a lot of restrictions regarding his work but we discussed that I do not feel comfortable. He says that he feels fatigued and with headaches. He had complaints of headaches even years ago.

> AR 600.

Dr. Dotti opined that Covey had "an ulterior motivation," but regardless, the only restrictions he would have if he actually had seizures were no driving, no climbing ladders and no operating heavy machinery. AR 601. Dr. Dotti referred Covey to an epilepsy specialist at the Marshfield Clinic, but Covey did not keep that appointment.

About six months later, on November 3, 2014, plaintiff saw neurologist Dr. Todd Rave at the Ministry Medical Group. Covey told Dr. Rave that he typically had 1 to 2 seizures a month and that it had been about four months since his last seizure. AR 1307. Covey said that when he has a seizure, he passes out and "shakes bad." However, Covey did not give a clear answer when Dr. Rave asked if he remembered the shaking or not. Covey denied having any episodes of "missed time or missed conversation." AR 1307. He had been working part-time on a potato inspection line, but he was let go after his son told the employer about his seizures. AR 1307.

Covey also reported excessive fatigue, noting that he slept most of the day. Dr. Rave thought Covey "probably" had epilepsy based on the abnormal EEG, but said he was concerned about "nonepileptic events," noting that Covey had provided some "inconsistencies" that did not fit well with an epilepsy diagnosis. AR 1308. Dr. Rave decided to continue to prescribe anti-seizure medication, referred Covey to a specialist for evaluation of sleep apnea and said Covey probably should continue to avoid driving. AR 1309. He told Covey to call his office right away if he had a seizure. AR 1309.

Dr. Rave saw Covey again on February 23, 2015. Covey said he had had a "short" seizure maybe a week or two ago where he passed out for a few seconds and was shaking, according to people he was with. Rave increased the dosage of Covey's medication. AR 1304. Rave noted that if Covey continued to have seizures, he might consider an Epilepsy Clinic referral where Covey could be monitored as an inpatient. Rave noted, however, that he still questioned whether Covey might be having "pseudo seizures"[1] and he wanted to talk to someone who had witnessed one. AR 1305.

On May 15, 2015, Covey saw physician assistant Steven Meyer for treatment of his breathing issues. Meyer noted that Covey's seizure disorder was stable on medication. AR 1298 However, on May 28, 2015, Covey told Dr. Rave he had had another seizure about 2-3 days ago. It was his "typical" seizure where he was coughing and he just "went out." AR 1294. There were no witnesses. Dr. Rave diagnosed intractable complex partial epilepsy and increased Covey's anti-seizure medication. AR 1295. He noted that he still had "some concerns about

---

[1] Pseudoseizures are not "fake" seizures but are a type of seizure caused by psychological conditions, often in reaction to stress, rather than by physical abnormalities in the brain. Https://www.healthline.com/health/pseudoseizures (visited March 18, 2019).

non-epileptic events," but noted that as the medication had increased, those had been less frequent. *Id*.

On April 19, 2016, Covey told a nurse practitioner that his epilepsy was better controlled and that his last seizure was about 2 months ago. AR 1288.

## 2. Statements to the Agency

Covey and his wife provided statements to the local disability agency in support of his applications. In July 2013, Covey's wife said that Covey was having three seizures a month. When asked the dates of the last three most recent attacks, if known, she wrote: June 14, 2010, April 22, 2012, and July 12, 2013. AR 356. On another undated Seizure Questionnaire, Covey's wife stated that Covey's seizures were from 5 to 20 minutes in length and he had about four per year. She denied that Covey had more than one type of seizure. AR 370.

## 3. Medical Source Statements

### a. Pat Chan, M.D.

On December 5, 2013, Dr. Pat Chan, a consulting physician for the local disability agency, reviewed Covey's medical records and determined that Covey did not have any exertional limitations. Dr. Chan noted that Covey had seizures "occasionally," and therefore he should avoid climbing ladders, ropes or scaffolding or working around dangerous machinery, but otherwise did not have any physical work restrictions. AR 513-520.

### b. Mina Khorshidi, M.D.

On August 4, 2014, Dr. Khorshidi, a state agency physician, reviewed Covey's file in connection with his request for reconsideration. Dr. Khorshidi concluded that Covey did not have a severe physical impairment. She found that his epilepsy diagnosis was not well-established, insofar as he did not report any seizures from April to December 2012 and Dr. Dotti had questioned whether Covey had had a fainting spell rather than an epileptic seizure. AR 612.

### c. Dr. Dotti

On June 9, 2016, Dr. Dotti completed a "Doctor Opinion Report" on which he was asked to indicate if Covey met either Listing 11.02 or 11.03 for Epilepsy. Dotti indicated that Covey met Listing 11.02, but provided the following explanation:

> Generalized seizures, however there are doubts about diagnosis. Long term monitoring in epilepsy center was considered; he may have pseudoseizures!

> AR 1330.

Dotti indicated, however, that Covey had very few work-related limitations. AR 1329-1333.

### d. Dr. Rave

On August 8, 2016, Dr. Rave completed a "Seizures Medical Source Statement" about Covey. AR 1325-1328. Rave indicated that he had seen Covey one to four times a year for the past two years, but noted Covey had been seen before that by other providers in the same department. Rave indicated that Covey had both convulsive and non-convulsive seizures during which he lost consciousness and awareness. Rave said Covey had general seizures once about

every one to two months and several partial seizures per month, and that control of the seizures was "suboptimal" on medication. Rave said that during a seizure, Covey "becomes unresponsive then generalized shaking," but said he also had multiple episodes of "decreased awareness & confusion." According to Rave, Covey did not have any associated mental problems, including depression, a short attention span or memory problems.

Rave said that after a seizure, Covey was unable to do activities for up to one hour. He indicated that Covey would likely miss more than four days a month as a result of his condition and had "unpredictable partial seizures" that prevented him from working reliably at any job.

## B. Mental Impairments

### 1. Richard Hurlburt, Ph. D.

Richard Hurlburt, Ph. D., saw Covey for a one-time mental status evaluation on October 17, 2013. Covey said his chief complaint was epilepsy for which he was taking medication and seeing Dr. Dotti. He reported having one or two seizures every two months and thought the medication helped. Hurlburt noted that Covey was "very vague" in describing the seizures.

Covey reported that he did not get out much, had low motivation and got depressed a lot. He described trying to do sports with his boys, aged 22 and 18, and a daughter, age 16, but said he was isolated and worried a lot. He took no medication for depression. Covey said he had attended school through the 11th grade and obtained a GED in 2000. He worked seasonally at cranberry marshes and then full time at a foundry for three and half years until being laid off in approximately 2009. The foundry job was his longest and most recent work.

On mental status questioning, Covey was able to give his date of birth and age, and the date of the evaluation and the day of the week. He did not know the current governor of Wisconsin. He could spell "world" correctly forwards, but not backward, and he could not count backward from 100 by 7s or by 3s. He thought 12 + 9 = 20 and 17 - 8 = 10, and could not recall three unrelated items after a 5-minute delay. Covey told Hurlburt that ever since the epilepsy, he "could not remember anything." AR 497. Hurlburt indicated that Covey "would have some difficulty with even simple instructions, difficulty with supervisors and difficulty with concentration, attention and pace." He diagnosed moderate to severe depression and noted that Covey reported memory issues "probably secondary to epilepsy." AR 498.

### B. Edmund Musholt, Ph.D.

On December 5, 2013, Edmund Musholt, Ph.D., a consultant for the state disability agency, conducted a psychiatric review that included Dr. Hurlburt's report and the other evidence in the record. Following the agency's special technique for evaluating mental impairments,[2] *see* 20 C.F.R. 1520a, Dr. Musholt first found that Covey had adduced enough evidence to establish that he had an affective disorder. At step two, Dr. Musholt evaluated Covey's degree of limitations in four broad categories of functioning (known in SSA jargon as the "Paragraph B" criteria), and found that Covey had "mild" limitations in daily activities and social functioning, "moderate" difficulty with his attention and concentration, and no episodes of decompensation. Because these limitations were not severe enough to satisfy the listing for

---

[2] Effective January 17, 2017, the agency revised the medical criteria for evaluating mental impairments. 81 Fed. Reg. 66138 (Jan. 17, 2017). However, these revised rules were not in effect at the time of the ALJ's September 2016 decision.

affective disorders, Dr. Musholt proceeded to evaluate Covey's mental residual functional capacity. AR 509.

To do this, Musholt completed a "Mental Residual Functional Capacity Assessment" form, SSA-4734-F4-SUP. On Section 1, Musholt rated Covey's capacity to sustain 20 different activities over a normal workday and workweek, finding that, for the most part, Covey's mental abilities were "not significantly limited." He found, however, that Covey was "moderately limited" in three abilities: (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; and (3) completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. AR 521-22. In Section III, titled "Functional Capacity Assessment," Musholt elaborated on his summary findings as follows:

> He is felt to have depression. While he reports seizures and an inability to remember anything, this is not consistent with his day to day activities and history of recent work. His performance on recent mental status exam was marked by inability to do anything, having numerical answers off consistently by 1, etc. He has the ability to understand, remember and carry out 1-2 step instructions. He is able to complete a normal work day and work week. He is able to get along with supervisors and co-workers such that he can complete a typical work day.
>
> He reports difficulty remembering instructions and having to read them over. This is reasonably credible. He reports he can't concentrate to do tasks right; yet he is able to hunt, fish and play cards, as well as do yard work and make home repairs. This is not credible. Overall, his statements are partially credible.
>
> AR 523.

### C. Jack Spear, Ph.D.

Jack Spear, Ph.D., another consultant for the state disability agency, conducted a second psychiatric review August 4, 2014. AR 627. Parting ways with Musholt, Dr. Spear concluded that Covey did *not* have a severe mental impairment. He noted that Covey had not received any mental health treatment during the time period at issue, he presented no mental health complaints to his providers at Ministry Medical Group, and mental status examinations had been unremarkable besides poor memory. Spear found that Dr. Hurlburt's medical source statement was not supported by other evidence in the file and was entitled to no weight. Dr. Spear observed that Hurlburt had based his opinions on Covey's alleged memory loss caused by epileptic spells, but noted that the diagnosis of epilepsy was "poorly established." AR 629.

## III. ADMINISTRATIVE PROCEEDINGS

### A. Hearing Testimony

At the administrative hearing, Covey testified that he had up to three seizures a month but sometimes could go for several months without having one. AR 1385-86. His seizures were preceded by coughing fits about half the time. AR 1395. He said that witnesses told him his seizures tended to last four to five minutes. After a seizure, he did not feel well for up to an hour. AR 1388-89. When asked if, in addition to convulsive seizures, he had seizures where he had a "blackout" or a "momentary lapse in time," Covey said he had not had that type of seizure for a few years. AR 1398-99.

Covey said he was unable to work because of his seizures. He also complained of generalized fatigue and memory problems, but he was not seeing a psychiatrist or therapist or

taking any medications for mental conditions. AR 1385-95. Covey said before his seizures started but after his foundry job ended, he had tried finding jobs but could not find anything except seasonal work. AR 1383-84.

In his hypothetical to the vocational expert, the ALJ proposed an individual of Covey's age, education and work experience, who was able to work at the light exertional level provided it required no working at heights or around moving machinery, and who was limited to "simple, routine, and repetitive tasks, and a job that did not require piece work or a fast-moving assembly line type work." AR 1399. The vocational expert testified that Covey could not perform his past work as a grinder because it required use of moving machinery, but could perform the jobs of house cleaner (which included light commercial cleaners or building cleaners), dining room or cafeteria attendant, or inspector/sorter, and that these jobs existed in significant numbers in the state and national economies. AR 1399-1400. When asked whether his answer would change if the individual "in addition to regularly scheduled breaks, would require a one-hour break unscheduled several times per month and would miss approximately four days per month on a regular basis," the vocational expert responded that the need for extra breaks would preclude the jobs, as would absences of anything greater than one day per month. AR 1400.

## B. ALJ's Decision

On September 16, 2016, the ALJ issued a written decision, finding that Covey suffered from a severe seizure disorder and affective disorder. In reaching that conclusion, the ALJ noted that there "were doubts about the diagnosis" of epilepsy, but that he was giving Covey the benefit of the doubt and finding he had a severe seizure disorder. AR 39. The ALJ did the same

with regard to Covey's alleged depression, finding that it was a severe impairment after noting that the state agency consultants were split on this issue. AR 40. The ALJ went on to find, however, that none of Covey's impairments, alone or in combination, met or medically equaled the criteria of any listed impairment.

In reaching this conclusion, the ALJ discounted the opinions of Dr. Rave and Dr. Dotti that Covey's seizure disorder was of listing level severity, citing two reasons: (1) their opinions were "not consistent with the much more limited frequency of attacks as shown by treatment records;" and (2) the opinions lacked "any reasonable medical basis as it is conceded that there are doubts about the very diagnosis." AR 44. With respect to Rave, the ALJ also noted that his report indicated that he had seen Covey on one to at most four occasions a year over two years, and these visits had "included those with others in his department." AR 41. As for Dotti, the ALJ noted that Dotti had indicated both in his report and in earlier notes that he was not convinced that Covey actually was having seizures but might be motivated by secondary gain. In addition, Dotti had suggested that Covey's only restrictions would be to avoid driving, climbing ladders, or operating heavy machinery. AR 41. The ALJ found:

> At certain points in the record, it is indicated that the claimant has actually gone for many months without any demonstrated syncopal behavior and it appears clear that he has actually not been having attacks with the frequency contemplated by the listings, while it is also indicated that even the diagnosis of epilepsy is in doubt.

AR 41.

As for Covey's alleged mental impairment, the ALJ noted that the medical record failed to show that Covey had received much, if any, treatment for a mental condition. At the same time, Covey's presentation during his one-time consult with Dr. Hurlburt "suggests that he was

presenting himself as much more impaired than any other records would support." AR 42. The ALJ found that Hurlburt's assessment could not be given any weight due to his "heavy reliance upon subjectively reported symptomatology which is highly inconsistent with the rest of the record."

Despite finding that Hurlburt's report was entitled to no weight, the ALJ gave Covey the benefit of the doubt and adopted Dr. Musholt's opinion that Covey had some mental limitations rather than that of Dr. Spear, who had found that Covey had no mental limitations.

The ALJ determined that Covey retained the residual functional capacity to perform a range of light work that did not require climbing ladders, ropes or scaffolds or being near moving machinery or near unprotected heights. In addition, the ALJ found that Covey was limited to simple, routine, repetitive tasks involving no piecework and no assembly line type work. AR 42. Relying on the vocational expert's testimony, the ALJ found that Covey was not disabled because there were a significant number of jobs in the state and national economies that Covey could perform notwithstanding his limitations.

OPINION

I. Standard of Review

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not

discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ also is expected to follow the Agency's own rulings and regulations when making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## II. Concentration, Persistence and Pace

As noted above, Dr. Musholt found, when assessing the Paragraph B Criteria of the listings for mental impairments, that Covey had moderate limitations in the category of concentration, persistence and pace. Then, in Section 1 of the MRFCA form, Musholt checked the boxes indicating that Covey was "moderately limited" in three abilities: (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; and (3) completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. AR 521-22. The ALJ expressly stated that he took these moderate restrictions into account

when formulating Covey's RFC, which was phrased as limiting Covey to "simple, routine, repetitive tasks involving no piece work or assembly line type work." AR 45. In turn, this RFC was used in the hypothetical posed to the VE relied upon by the ALJ to conclude that there were a significant number of jobs that Covey could perform notwithstanding his restrictions.

In a challenge that is routinely brought in SSI cases involving a moderate restriction in concentration, persistence or pace, Covey contends that the ALJ's RFC fails to adequately capture the "moderate" limitations found by Dr. Musholt. Covey has good reason to bring this challenge: the Court of Appeals for the Seventh Circuit scrutinizes ALJs' hypotheticals in cases involving such moderate limitations and demands tight correlation between those limitations and the terminology used by the ALJ when s/he expresses the claimant's RFC. *See, e.g.*, *DeCamp v. Berryhill*, 916 F.3d 671, 675-76 (7th Cir. 2019) (it was error for ALJ to limit plaintiff to "unskilled work" with no "fast-paced production line or tandem tasks" "because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace"); *see also O'Connor-Spinner*, 627 F.3d at 620. *See also Moreno*, 882 F.3d at 730 (rejecting argument that ALJ's reference to simple work instructions and to routine, low-stress work reasonably accommodated Moreno's moderate difficulties in concentration, persistence or pace); *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015) (failure to define "fast paced production" was problematic); *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009) ("simple, routine tasks" did not account for limited ability to understand instructions); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004) ("simple, routine" tasks did not adequately account for "impairment in

concentration"); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) ("simple, unskilled work" does not account for difficulty with memory, concentration or mood swings).

The Commissioner responds that the ALJ's hypothetical in this case was adequate because it corresponded to Dr. Musholt's narrative RFC assessment. Specifically, Musholt found that Covey had the ability to understand, remember, and carry out one to two-step instructions; complete a normal workday and workweek; and get along with supervisors and coworkers such that he could complete a typical workday.

The Commissioner is correct that the Seventh Circuit has held that when a medical expert "translates" the claimant's work-related limitations into a narrative residual functional capacity assessment, the ALJ may rely on the narrative, provided, however, that it "adequately encapsulates and translates those worksheet observations." *Varga*, 794 F.3d at 816; *Capman v. Colvin*, 617 Fed. Appx. 575, 579 (7th Cir. 2015) (ALJ may reasonably rely on psychologist's "bottom line-assessment" in narrative section of residual functional capacity assessment, at least where it is not inconsistent with checklist findings in other section of worksheet); *Milliken v. Astrue*, 397 Fed. Appx. 218, 221 (7th Cir. 2010) (ALJ entitled to rely on medical expert who "effectively translate[s] an opinion regarding the claimant's mental limitations into an RFC assessment."); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (in formulating hypothetical for vocational expert, ALJ reasonably relied on physician's opinion that plaintiff could perform low-stress, repetitive work). *See also Pitts v. Colvin*, No. 15-CV-518-JDP, 2016 WL 3951227, at *2 (W.D. Wis. July 20, 2016) ("simple, routine, and repetitive work may appropriately accommodate moderate limitations in CPP if that limitation would address the claimant's specific deficiencies"). *But see DeCamp*, 2019 WL 936692, at *4 ("[E]ven if an ALJ

may rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms such as the PRT and MRFC forms.")

On reply, Covey appears to acknowledge that the ALJ's limitation to simple, routine, repetitive tasks corresponds to Dr. Musholt's finding that Covey was able to understand, remember, and carry out one to two-step instructions, which in turn appears to reflect his worksheet findings that Covey would have moderate limitations in his ability to understand, remember and carry out *detailed* instructions. *Accord Capman*, 617 Fed. Appx. at 577, 579 (upholding RFC limiting claimant to simple and routine tasks and limited interactions with others because it was consistent with the state agency psychologist's narrative opinion that the claimant could handle the tasks and stress of unskilled work). Thus, the only limitation at issue is Dr. Musholt's conclusion that Covey was "moderately limited" in his ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods." AR 521-22. Although the Commissioner treats this last ability as single-factored, it encompasses two capabilities: (1) completing a normal workday and workweek; and (2) performing at a consistent pace without unreasonable rest periods.

As for Covey's ability to complete a normal workday and workweek, Dr. Musholt expressly found in his narrative description of Covey's RFC that he was "able to complete a normal work day and work week." In other words, Dr. Musholt found that Covey's limitation in this area, though moderate, did not preclude him from performing simple work on a regular

basis. Thus, there was no need for the ALJ to include this limitation in his RFC and corresponding hypothetical.

This leaves Covey's moderate limitation in his ability to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Musholt did not say anything in his narrative that addresses work pace. However, the ALJ addressed pace in the hypothetical by finding that Covey could perform "no piece work or fast-moving assembly line type work." Covey argues that this was inadequate, arguing that it is similar to the "not production rate" limitation that this court rejected in *Bennett v. Berryhill*, 17-cv-809-slc, 2018 WL 3425290 at *4 (W.D. Wis. July 16, 2018). In that case, this court noted that by failing to define the term "not production rate," the ALJ made it "impossible for the [vocational expert] to assess whether a person with [the plaintiff's] limitations could maintain the pace proposed." *Id*. (quoting *Varga*, 794 F.3d at 815).

I agree with Covey that there is no meaningful distinction between "not production rate" and "no piece work or fast-moving assembly line type work." *See also DeCamp*, 2019 WL 923692, at *4 (rejecting similar language). Nevertheless, this court did not hold or suggest in *Bennett* that such language *never* can be an adequate characterization of a claimant's moderate pace limitations. Notably, the claimant in *Bennett* suffered from post traumatic stress disorder, for which he received "significant psychotherapy, counseling, and pharmacological therapy . . . as well as episodic exacerbations requiring inpatient care." *Bennett*, 17-cv-809-slc, dkt. 7, at 16. By contrast, Covey never received any inpatient treatment, outpatient psychotherapy, counseling or medication for any mental impairment. To the contrary, the only medical evidence pertaining

to Covey's alleged mental impairment consisted of a single consultative evaluation with Dr. Hurlburt at which he was found to have depression.

The ALJ did not give any weight to that evaluation, finding that Dr. Hurlburt relied too heavily on Covey's subjective complaints, which were inconsistent with the rest of the record. Notably, Covey does not challenge this aspect of the ALJ's decision. Having rejected Hurlburt's report, then, the ALJ would have had good reason to adopt Dr. Spear's conclusion that Covey had no mental limitations, insofar as Spear had also remarked that Hurlburt's report was flawed. Instead, the ALJ explained that he had given Spear's report "some consideration," but was making a "very considerable allowance" for Covey's allegations and giving "somewhat greater weight" to the limitations proposed by Musholt. AR 44, 45.

The bottom line is that the ALJ clearly bent over backwards in Covey's favor when he found that the record could support any mental limitations whatsoever for Covey. In this particular situation, it would unduly exalt form over substance to remand this case solely for the ALJ to articulate more precisely Covey's "moderate" pace limitations. The ALJ accounted for such limitations by excluding a large subset of unskilled work with the highest pace demands, namely, piece work and fast-moving assembly line type work. This seems to strike the proper balance between Dr. Spear's conclusion of no limitations and Dr. Musholt's overly-generous finding of "moderate" limitations in this area. Moreover, although this court will not play vocational expert, common sense suggests that neither the light commercial cleaner jobs nor the cafeteria attendant job identified by the vocational expert would seem to have a demanding work pace.

Upholding the ALJ's hypothetical and ultimate decision in this case might be viewed as flouting recent Seventh Circuit decisions on this topic; on this record I disagree, hewing to the Seventh Circuit's venerable admonition that courts should refrain from "sacrific[ing] on the altar of perfectionism the claims of other people stuck in the queue." *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985). In this case, it defies common sense to remand this case for a more meticulous–punctilious?–hypothetical regarding Covey's moderate limitations in concentration, persistence and pace where it appears that the record would have supported a conclusion by the ALJ that Covey had no medically determinable severe impairments at all.

### III. Dr. Rave's Medical Source Statement

Covey next argues that the ALJ erred in giving little weight to Dr. Rave's August 2016 opinion that Covey met the listing requirements for epilepsy. Rave saw Covey three times between November 2014 and May 2015, diagnosed him with epilepsy and prescribed anti-seizure medication. Rave opined that Covey met the criteria of both listed section 11.02 and 11.03. Both listings required documentation of epilepsy "by detailed description of a typical seizure pattern, including all associated phenomena." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.02, 11.03. Listed section 11.02, for convulsive epilepsy, requires that the seizures occur more frequently than once per month, in spite of at least three months of prescribed treatment with daytime episodes (loss of consciousness or convulsive seizures); or nocturnal episodes manifesting residuals which interfere significantly with activity during the day. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02. Listed section 11.03, for nonconvulsive epilepsy, requires documentation that seizures occur more frequently than once per week, in spite of at least three

months of prescribed treatment, with alteration of awareness or loss of consciousness and transient postical manifestation of unconventional behavior or significant interference with activity during the day.

Covey argues that Rave was a treating physician whose opinion should have been given controlling weight under 20 C.F.R. § 404.1527. Under that regulation, an ALJ is to give "controlling weight" to an opinion from a treating source about the nature and severity of the claimant's impairments if: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) it is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(a)(2).[3] If the ALJ does not give the opinion controlling weight, then s/he is to decide how much weight to give it by considering a list of factors, including the nature and length of the treatment relationship, the evidence cited in support of the opinion, the opinion's consistency with other evidence in the record, and the doctor's specialty. 20 C.F.R. §404.1527(c). The ALJ must provide "good reasons" in his or her decision for the weight he gives a treating source's opinion. *Id.*

Covey argues that the ALJ failed to perform the analysis required of the treating physician rule. I disagree. The ALJ explained that he was giving Dr. Rave's opinion "very little weight" because: (1) his opinion as to the frequency of Covey's seizures was inconsistent with treatment records showing far fewer attacks; and (2) his opinion that Covey suffers from epilepsy was not well-supported by the medical evidence, which revealed that there were doubts about the epilepsy diagnosis. In other words, the ALJ found that Dr. Rave's opinion was neither well-supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent

---

[3]The Agency recently revised its rules for evaluating medical opinions. *See* 20 C.F.R. § 404.1520c. However, the old rules still apply to claims that were filed before March 27, 2017.

with other evidence in the record. Thus, regardless whether the ALJ actually identified Dr. Rave as a treating source, he analyzed the opinion as directed by the rule.

Covey argues that neither of these findings is supported by substantial evidence in the record. With regard to the clinical support for Dr. Rave's opinion, Covey argues that when noting that the diagnosis of epilepsy was "in doubt," the ALJ appears to have been relying on Dr. Dotti's report. According to Covey, the fact that Dr. Dotti may have had doubts about the epilepsy diagnosis is irrelevant, noting that Dotti is a sleep specialist, not an epilepsy specialist. However, even Dr. Rave raised the question whether Covey may be having "pseudo seizures" or "nonepileptic events," and Dr. Atkinson wondered whether Covey might just be having fainting spells brought on by severe coughing. Thus, the record supports the ALJ's finding that there were doubts about whether Covey's spells were actually caused by epilepsy (abnormal brain activity) or something else.

In any case, this discussion is largely beside the point: notwithstanding this equivocal evidence, the ALJ still gave Covey the benefit of the doubt and found that he had a seizure disorder. Even so, a seizure disorder is not *de facto* disabling because seizures often can be controlled with medication. Whether a person is disabled from seizures hinges on their frequency and severity. The Agency presumes that person who has more than one convulsive seizure a month (Listing 11.02) or more than one nonconvulsive seizure a week (Listing 11.03) in spite of taking anti-seizure medication cannot work.

Dr. Rave opined that Covey had both types of seizures at the frequency demanded by the Listings. The ALJ was right to reject this opinion, which plainly was based on Covey's self-reports. There is no evidence that Dr. Rave personally witnessed Covey having a seizure. As the

ALJ noted, Covey's reports of the frequency of his seizures varied widely, from four times a year, to once every one to two months, to up to three times a month. In addition, there were significant periods in the medical record where Covey had been seizure-free. For example, Covey went at least six months without having a seizure after his initial seizure in April 2012, even though he had just begun taking medication at that point. Another time, Covey reported having been seizure-free for four months. On top of the inconsistency about Covey's seizure frequency, at least one treating physician (Dr. Dotti) suspected that Covey was malingering in order to get disability benefits. These were all good reasons for the ALJ to reject Dr. Rave's report of at least monthly convulsive seizures and at least weekly non-convulsive seizures.[4]

Still, Covey argues, even if the ALJ might have had good reason to reject Dr. Rave's opinion that he has seizures frequently enough to satisfy the listing, the ALJ lacked a reasoned basis to reject Dr. Rave's opinion that Covey would miss at least four days of work each month due to his epilepsy. But the ALJ rejected this opinion for the same reason he rejected Dr. Rave's opinion concerning the listings: the record did not support the frequency of seizures endorsed by Dr. Rave. Even Covey did not testify that he had four seizures a month, every month. As just discussed, there was no support in the medical records for such a high frequency of seizures. Accordingly, the ALJ properly found no basis to include in his residual functional capacity assessment any limitations due to seizures other than the requirement that Covey should not climb ladders, ropes or scaffolds or work around hazards, which were the limitations endorsed

_____

[4] Curiously, Covey argues that the ALJ should have found that he met Listing 11.03, which requires evidence of nonconvulsive seizures occurring at least once a week. Yet all Covey points to in support of his position is Dr. Rave's report. Among all of Dr. Rave's findings, this one has the least support in the record. Nowhere in the records before the ALJ did Covey report having weekly seizures. Moreover, Covey's wife denied that Covey had more than one type of seizure, and Covey testified at the hearing that he had not had non-convulsive seizures for a number of years.

by Dr. Chan. In sum, because the ALJ provided adequate reasons, supported by evidence in the record, for his determination to afford Dr. Rave's opinion little weight, remand is not required.

ORDER

IT IS ORDERED THAT the decision of the Acting Commissioner of Social Security denying Jeffrey Covey's application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act is AFFIRMED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 18th day of March, 2019.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge